### In re NYSE SPECIALISTS SECURITIES LITIGATION.

#### No. 03 Civ. 8264(RWS).

United States District Court, S.D. New York.

June 5, 2009.

Coughlin Stoia Geller Rudman & Robbins LLP, by: Mark Solomon, Esq., Byron S. Georgiou, Esq., David W. Mitchell, Esq., Alexandra S. Bernay, Esq., Eric I. Niehaus, Esq., Suzanne H. Stevens, Esq., San Diego, CA, for Plaintiff.

Morgan, Lewis & Bockius LLP, by: John M. Vassos, Esq., Rachelle M. Barstow, Esq., Davis Polk & Wardwell, by: George A. Sirignano, III, Esq., Ian R. Rooney, Esq., James I. McClammy, Esq., Lawrence J. Portnoy, Esq., Weil, Gotshal & Manges LLP, by: Irwin H. Warren, Esq., Joanna R. Varon, Esq., Stephen A. Radin, Esq., Katten Muchin Zavis Rosenman, New York, NY, by: Steven E. Schiffman, Esq., Dickstein Shapiro Morin & Oshinsky LLP, Washington, D.C., by: Howard Schiffman, Esq., Wilmer Cutler Pickering Hale and Dorr LLP, by: Anne K. Small, Esq., Robert B. McCaw, Esq., Robert W. Trenchard, Esq., Wendy A. Harris, Esq., King & Spaulding LLP, New York, NY, by: Deborah S. Burstein, Esq., Richard A. Cirillo, Esq., Wolf, Block, Schorr & Solis–Cohen LLP, Philadelphia, PA, by: Andrew C. Curley, Esq., Brian J. Slipakoff, Esq., M. Norman Goldberger, Esq., Nathan E. Kase, Esq., Sullivan & Cromwell LLP, by: Robert J. Guiffra, Jr., Esq., New York, NY, for Defendants.

*OPINION*

SWEET, District Judge.

Lead Plaintiff, California Public Employees' Retirement System ("CalPERS" or "Lead Plaintiff") has moved, pursuant to Rule 23, Fed.R.Civ.P., for an order certifying this consolidated action as a class action and naming CalPERS and Market Street Securities, Inc. ("Market Street") representatives of the class.

Defendant Specialist Firms[1] have moved to strike the Report of Shane A. Corwin,

---

1. For the purposes of this opinion, LaBranche & Co., LLC ("LaBranche LLC"); LaBranche & Co., Inc. ("LaBranche Inc."); Spear, Leeds & Kellogg Specialists LLC ("Spear Leeds LLC"); Spear, Leeds & Kellogg, L.P. ("Spear Leeds LP"); Van der Moolen Specialists USA, LLC ("VDM Specialists"); Van der Moolen Holding, N.V. ("VDM Holding"); Fleet Specialist, Inc. ("Fleet Specialist"); FleetBoston Financial Corp. ("FleetBoston Corp."); Bear Wagner Specialists LLC ("Bear Wagner LLC"); Bear Stearns & Co., Inc. ("Bear Stearns"); SIG Specialists, Inc.

Ph.D. ("Corwin Report"), and the Report of Matthew Curtin, CISSP, in Support of Lead Plaintiff's Motion for Class Certification ("Curtin Report").

Lead Plaintiff has also submitted a motion to Strike Improperly Submitted Legal Argument in Defendants' Appendix to the Specialist Firms' Memorandum of Law in Opposition to Lead Plaintiff's Motion for Class Certification.

For the reasons set forth below, Lead Plaintiff's motion for class certification is granted, and CalPERS and Market Street are appointed class representatives. The Specialist Firms' motion to strike the Corwin and Curtin Reports is denied, as is CalPERS' motion to strike.

## I. PRIOR PROCEEDINGS

This is a consolidated securities fraud action brought on behalf of a purported class of investors against defendants, specialist firms on the New York Stock Exchange ("NYSE") and the NYSE (collectively, "Defendants"), alleging violations of the federal securities laws. The action was commenced on October 17, 2003, with the filing of a complaint by Pirelli Armstrong Tire Corporation Retiree Medical Benefits Trust on behalf of itself and all others similarly situated (03 Civ. 8264). Additional complaints were subsequently filed by Lawrence Marcus on October 27, 2003 (03 Civ. 8521), Empire Programs, Inc. ("Empire NJ") on November 11, 2003 (03 Civ. 8935), and CalPERS on December 16, 2003 (03 Civ. 9968). On March 16, 2004, Rosenbaum Partners, LP filed a complaint in its individual capacity (04 Civ.2038).

By an opinion dated May 27, 2004, the above-referenced actions were consolidated for all purposes under Docket Number 03 Civ. 8264. *See Pirelli Armstrong Tire Corp. Retiree Med. Benefits Trust v. LaBranche & Co., Inc.,* 229 F.R.D. 395, 401–02 (S.D.N.Y. 2004) ("*Pirelli*"). CalPERS and Empire NJ were appointed co-lead plaintiffs, and lead counsel was selected. *Id.* at 402–21. A con-

solidated complaint (the "Complaint") was filed on September 17, 2004.

On November 16, 2004, the Specialist Firms moved to dismiss the Complaint pursuant to Rules 9(b) and 12(b)(6), Fed.R.Civ.P. On November 17, 2004, the NYSE moved to dismiss the Complaint, also pursuant to Rule 12(b)(6), Fed.R.Civ.P. In an opinion dated December 13, 2005, the Complaint was dismissed with prejudice in its entirety as to the NYSE. *In re NYSE Specialists Sec. Litig.,* 405 F.Supp.2d 281, 302–06 (S.D.N.Y.2005) (the *"December 2005 Opinion"*). The *December 2005 Opinion* also dismissed the state law claims against all Defendants, the Section 20(a) claim as to Susquehanna, and the Section 10(b) manipulative scheme claim as to Spear Leeds LP, Goldman Sachs, the Goldman Sachs Group, FleetBoston Corp., Bank of America, Quick & Reilly, Bear Stearns, SIG LLP, and Susquehanna. *Id.* at 306–20. While denying the Specialist Firms' motion to dismiss the remaining claims, the Court held that no customer could recover with respect to trades already covered by the Specialist Firms' regulatory settlements. *Id.* at 310–11. Finally, the Court denied as moot a motion filed on October 1, 2004, by CalPERS and Empire NJ, and marked as fully submitted on November 17, 2004, to modify the Private Securities Litigation Reform Act ("PSLRA") discovery stay. *Id.* at 320–21.

On January 12, 2006, CalPERS and Empire NJ moved for an order granting certification and entry of final judgment based on the Court's final determination of the claims against the NYSE. A clerk's judgment was entered on February 17, 2006. CalPERS and Empire NJ appealed, and on September 18, 2007, the Court of Appeals affirmed the judgment as to the NYSE's absolute immunity, but vacated and remanded this Court's ruling that CalPERS and Empire NJ lacked standing under Rule 10b–5 to pursue their misrepresentation claims against the NYSE. *In re NYSE Specialists Sec. Litig.,* 503 F.3d 89 (2d Cir.2007).

("SIG Specialists"); Susquehanna International Group, LLP ("Susquehanna"); Performance Specialist Group, LLC ("Performance Specialist"); George M.L. LaBranche, IV; ("M.LaBranche"); Goldman, Sachs & Co. ("Goldman

Sachs"); The Goldman Sachs Group, Inc. ("Goldman Sachs Group"); Bank of America Corp. ("Bank of America"); and Quick & Reilly, Inc. ("Quick & Reilly"), are referred to collectively as the "Specialist Firms."

An order was signed on January 24, 2006, permitting CalPERS and Empire NJ to file an amended complaint adding Martin as party plaintiff. The Amended Consolidated Complaint (the "Amended Complaint") was filed on February 2, 2006.

On March 3, 2006, purported plaintiff class member Sea Carriers Corporation ("Sea Carriers") filed a motion for an order to: (1) "decertify" Empire NJ as co-lead plaintiff; (2) add Sea Carriers as a named plaintiff and "certify" Sea Carriers to replace Empire NJ as co-lead plaintiff; and (3) approve Sea Carriers' election of Becker Meisel as co-lead plaintiff's counsel. This motion was heard and marked fully submitted on April 26, 2006. On August 14, 2006, Martin similarly moved for an order appointing him as co-lead plaintiff to any extent that Empire NJ does not continue as co-lead plaintiff. This motion was heard and marked fully submitted on October 4, 2006. On February 26, 2007, the Court issued an opinion granting Sea Carriers' motion to disqualify and remove Empire NJ as co-lead plaintiff, and denying its motion to replace Empire NJ as co-lead plaintiff. *In re NYSE Specialists Sec. Litig.*, 240 F.R.D. 128, 139 (S.D.N.Y.2007). The Court also denied Martin's motion to be appointed co-lead plaintiff in place of Empire NJ. *Id.* at 143–45.

On December 11, 2006, Sea Carriers and its president filed motions to quash subpoenas served upon them by the Specialist Firms. The motion was marked fully submitted on January 25, 2007, and granted by the Court on July 5, 2007.

Lead Plaintiff filed the instant motion for class certification on June 28, 2007. CalPERS filed its motion to Strike Improperly Submitted Legal Arguments on December 13, 2007. The Specialist Firms filed their motion to strike the Corwin and Curtin Reports on January 25, 2008. Oral argument was heard on the motions on April 30, 2008.

## II. THE FACTS

The parties' familiarity with the facts is assumed. In brief, trades in stocks for the 2,800 listed companies on the NYSE are handled by one of the seven Specialist Firms. While only one specialist can be designated for a given stock listed in the NYSE, a given Specialist Firm may handle more than one stock.

All trading on the NYSE is conducted through an auction process, facilitated by individual specialists in one of two ways. First, orders can be conveyed orally and in-person to the specialist handling trades in that company's stock by a floor broker on the floor of the NYSE. Alternatively, orders can be transmitted to the specialist through the NYSE's electronic order entry system, known as the Super Designated Order Turnaround System ("SuperDOT"). Electronic orders appear on an electronic workstation referred to as a "Display Book." Once an order is received, the specialist has three choices. He can execute the order against another order in the Display Book, against an order represented by a floor broker, or against his own inventory.

Specialists are responsible for maintaining a two-sided auction market by providing an opportunity for public orders to be executed against each other. In order to do so, they serve dual roles, acting as both "agent" and "principal." Once an order has been received, the specialist, acting as agent, is required to match the open order to buy with an open order to sell within the same price range. Specialists generally receive no compensation for filling orders as agents.

When there are no matching orders to sell and orders to buy, specialists are permitted to trade on a "principal" basis by either selling the stock from their own proprietary account to fulfill the investor's order to buy or buying the stock and holding it in their own account to fill an investor's order to sell.

### THE NYSE Rules

The NYSE has several rules in place governing specialists' conduct. NYSE Rule 104 places a negative obligation on specialists, prohibiting "purchases or sales of any security in which such specialist is registered ... unless such dealings are reasonably necessary to permit such specialist to maintain a fair and orderly market."

NYSE Rule 92 prohibits proprietary trading, with limited exceptions, when the spe-

cialist "has knowledge of any particular unexecuted customer's order to buy (sell) such security which could be executed at the same price."

The NYSE also has in place certain mechanisms to implement the so-called "priority rules." For example, when the Display Book is used to execute a trade, as opposed to trades executed orally on the NYSE floor, the Display Book automatically places executable public orders on the buy and sell sides of the trade. *See* SEC Office of Compliance Inspections and Examinations Report ("OCIE Rep.") at 14, Pl.Ex. 16. When a specialist attempts to trade ahead of a customer order, the Display Book highlights the customer order to alert the specialist of a potential violation. *Id.* To execute a trade ahead of a public customer order, the specialist is required to enter extra keystrokes. *Id.* In short, "NYSE trading systems are designed to prevent specialists from accidentally violating the Priority Rule." OCIE Rep. at 3.

### The SEC Investigation

On March 30, 2004, and July 26, 2004, the Securities Exchange Commission ("SEC") announced that it had instituted administrative and cease-and-desist proceedings against the seven Specialist Firms, and that each of the firms had reached a settlement agreement with the SEC and NYSE providing for the payment of more than $240 million in penalties and disgorgement. The allegations with respect to each of the Specialist Firms are briefly summarized below.

### 1. LaBranche LLC

The SEC and NYSE determined that between January 1999 and 2003, LaBranche LLC engaged in interpositioning, resulting in customer disadvantage of $8,689,574, trading ahead, resulting in customer disadvantage of $30,969,236, and non-execution of limit orders, resulting in customer disadvantage of $1,987,630. The total customer disadvantage was determined to be $41,646,440. It was further determined that the interpositioning violations with respect to certain transactions were done by certain LaBranche LLC specialists with scienter, and that certain senior

executives at LaBranche LLC knew about the illicit trading.

Based on the SEC and NYSE determinations, which were neither admitted nor denied, LaBranche LLC agreed to pay $41,646,440 in disgorgement and $21,872,320 in civil penalties. *See December 2005 Opinion,* at 292–93.

### 2. Spear Leeds LLC

The SEC and NYSE determined that from January 1999 through 2003, Spear Leeds LLC engaged in interpositioning, trading ahead and intentional non-execution of limit orders and that such practices resulted in customer disadvantage of $28,776,072. Of this total, $8,309,962 of customer disadvantage was the result of interpositioning, $19,430,004 was the result of trading ahead, and $1,036,106 was the result of non-execution of limit orders. It was determined that the interpositioning violations with respect to certain transactions were done by certain Spear Leeds LLC specialists with scienter, and that certain Spear Leeds LLC senior executives knew about the illicit trading.

Based on these determinations, which were neither admitted nor denied, Spear Leeds LLC paid $28,776,072 in disgorgement and $16,496,406 in civil penalties. *Id.* at 293–94.

### 3. VDM Specialists

The SEC and NYSE determined that from January 1999 through 2003, VDM Specialists engaged in interpositioning, resulting in $14,629,743 of customer disadvantage, trading ahead, resulting in $19,209,087 of customer disadvantage, and intentional non-execution of limit orders, resulting in $1,087,783 in customer disadvantage, and that such conduct resulted in a total of $34,926,613 of customer disadvantage. It was determined that the interpositioning in certain stocks was done with scienter and that certain members of VDM Specialists' management committee engaged in interpositioning in certain stocks.

Based on these determinations, which were neither admitted nor denied, VDM Specialists agreed to pay $34,926,613 in disgorge-

ment and $22,748,491 in civil penalties. *Id.* at 294.

#### 4. Fleet Specialist

The SEC and NYSE determined that from January 1999 through 2003, Fleet Specialist engaged in interpositioning, trading ahead and intentional non-execution of limit orders, and that such practices resulted in $38,013,594 of customer disadvantage. Of this total, $9,797,398 of customer disadvantage was caused by interpositioning, $26,969,830 was caused by trading ahead, and $1,246,366 was caused by non-execution of limit orders. It was determined that certain interpositioning transactions were done with scienter.

Based on these determinations, which were neither admitted nor denied, Fleet Specialist agreed to pay $38,013,594 in disgorgement and $21,083,875 in civil penalties. *Id.* at 294–95.

#### 5. Bear Wagner LLC

The SEC and NYSE determined that from January 1999 through 2003, Bear Wagner LLC engaged in interpositioning, trading ahead and intentional non-execution of limit orders and that such conduct resulted in $10,724,903 of customer disadvantage. Of this total, $2,074,303 was caused by interpositioning, $8,085,348 was caused by trading ahead, and $565,252 was caused by non-execution of limit orders. It was determined that certain interpositioning transactions were done with scienter.

Based on these determinations, which were neither admitted nor denied, Bear Wagner LLC agreed to pay $10,724,903 in disgorgement and $5,534,543 in civil penalties. *Id.* at 295.

#### 6. SIG Specialists

The SEC and NYSE determined that from January 1999 and 2003, SIG Specialists engaged in interpositioning, resulting in $282,983 of customer disadvantage, trading ahead, resulting in $1,684,525 of customer disadvantage, and non-execution of limit orders, resulting in $78,063 in customer disadvantage, and that such conduct resulted in a total of $2,045,571 of customer disadvantage. It was determined that certain interpositioning transactions were done with scienter.

Based on these determinations, which were neither admitted nor denied, SIG Specialists agreed to pay $2,045,571 in disgorgement and $988,018 in civil penalties. *Id.*

#### 7. Performance Specialist

The SEC and NYSE determined that from January 1999 through 2003, Performance Specialist engaged in interpositioning, trading ahead and non-execution of limit orders that resulted in $1,491,171 of customer disadvantage. Of this total, $140,488 of customer disadvantage was caused by interpositioning, $1,283,098 was caused by trading ahead, and $67, 585 was caused by non-execution of limit orders. It was determined that certain interpositioning transactions were done with scienter.

Based on these determinations, which were neither admitted nor denied, Performance Specialists agreed to pay $1,491,171 in disgorgement and $680,761 in civil penalties. *Id.* at 295–96.

### *The Government Trials*

In April 2005, a grand jury in this district handed down indictments against fifteen current and former individual specialists at the NYSE alleging violations of 15 U.S.C. §§ 78j(b) and 78ff and 17 C.F.R. § 240.10b–5.

Indictments against five individual specialists proceeded to trial. VDM Specialists' Michael Hayward and Michael Stern, and Fleet Specialist's David Finnerty, were convicted of violating 15 U.S.C. § 78j and 78ff and 17 C.F.R. § 240.10b–5. *See United States v. Hayward,* No. 05 Cr. 390–03(SAS) (S.D.N.Y. July 14, 2006); *United States v. Stern,* No. 05 Cr. 390–04(SAS) (S.D.N.Y. July 14, 2006); *United States v. Finnerty,* 474 F.Supp.2d 530, 536 (S.D.N.Y.2007), aff'd 533 F.3d 143 (2d Cir.2008). The district court later granted Finnerty's post-trial motion for a judgment of acquittal based on the government's failure to prove that "interpositing constituted a deceptive act within the meaning of the federal securities laws because it did not provide proof of customer expecta-

tions." *Finnerty,* 474 F.Supp.2d at 542. The convictions of Hayward and Stern were reversed on the same grounds by the Court of Appeals. *See United States v. Hayward,* 284 Fed.Appx. 857 (2d Cir.2008).

VDM Specialists' Richard Volpe and Robert Scavone were acquitted. *See United States v. Volpe,* No. 05 Cr. 390–05(SAS) (S.D.N.Y. Sept. 18, 2006); *United States v. Scavone,* No. 05 Cr. 390–06(SAS) (S.D.N.Y. Aug. 2, 2006).

Two specialists, VDM Specialists' Joseph Bongiorno and Patrick McGagh, plead guilty to criminal securities fraud. *See United States v. Bongiorno,* No. 05 Cr. 390–01(SHS) (S.D.N.Y. Oct. 13, 2006); *United States v. McGagh,* No. 05 Cr. 390–02(SHS) (S.D.N.Y. Oct. 13, 2006). In light of the Court of Appeals' decisions in *Finnerty* and Hayward, the convictions of both Bongiorno and McGagh were later vacated. *See Bongiorno,* No. 05 Cr. 390–01(SHS) (S.D.N.Y. Aug. 25, 2008); *McGagh,* No. 05 Cr. 390–02(SHS) (S.D.N.Y. Aug. 25, 2008).

Orders of nolle prosequi were filed with respect to the remaining individual specialist defendants. *See United States v. Deboer,* No. 05 Cr. 396(DLC) (S.D.N.Y. Aug. 25, 2008); *United States v. Hayes,* No. 05 Cr. 390–07(SAS) (S.D.N.Y. Nov. 22, 2006); *United States v. Johnson,* No. 05 Cr. 392(NRB) (S.D.N.Y. Nov. 21, 2006); *United States v. Delaney,* No. 05 Cr. 394(HB) (S.D.N.Y. Nov. 21, 2006); *United States v. Hunt,* No. 05 Cr. 395(DAB) (S.D.N.Y. Nov. 21, 2006); *United States v. Murphy,* No. 05 Cr. 397(DC) (S.D.N.Y. Nov. 21, 2006); *United States v. Foley,* No. 05 Cr. 391(HB) (S.D.N.Y. Oct. 10, 2006); *United States v. Fee,* No. 05 Cr. 398(PKC) (S.D.N.Y. Sept. 22, 2006).

### The Proposed Class Representatives

Lead Plaintiff CalPERS is the largest public retirement system in the United States. CalPERS manages pension and health benefits for approximately 1.5 million California employees, retirees and their families. As of April 30, 2007, CalPERS' investment portfolio had a market value of $243.9 billion. According to the Amended Complaint, CalPERS purchased and/or sold almost 3 billion shares of NYSE-listed stock between Octo-

ber 17, 1998, and October 15, 2003. Am. Compl. ¶ 17.

Proposed class representative Market Street is a specialist and market maker for options on the Philadelphia Stock Exchange. Market Street purchased and sold more than 280 million shares of stock on the NYSE via SuperDOT during the proposed class period, from January 1, 1999, through October 15, 2003 (the "Class Period").

### The Amended Complaint

The Amended Complaint alleges that the Specialist Firms systematically violated NYSE Rules and federal securities laws with the knowledge and active participation of the NYSE. Specifically, the Specialist Firms are alleged to have engaged in the following practices:

(i) "interpositioning" in violation of the Specialist Firms' "negative obligation," in which a Specialist Firm "steps in the way" of matching orders of public sellers and/or buyers of stock to generate riskless profits to the detriment of Class members; (ii) "trading ahead" or "front-running," in which Specialist Firms take advantage of their confidential knowledge of public investors' orders ... and trade for their own account as principals before completing orders placed by public investors; (iii) "freezing the book," in which a Specialist Firm freezes its Display Book on a stock so it can first engage in trades for its own account prior to entering and then executing public investors' orders ... (iv) manipulating the tick or price of a stock to effect principal trades; and (v) falsifying trade records and reports to cover up their illegal and manipulative practices.

Am. Compl. ¶ 3. According to the Amended Complaint, each firm's approximate share of the NYSE annual trading volume is: LaBranche LLC (29%); Spear Leeds LLC (20%); VDM Specialists (12.5%); Fleet Specialist (18%); Bear Wagner LLC (16%); SIG Specialists (3%); and Performance Specialist (1.5%). *Id.* ¶ 19.

### III. CALPERS' MOTION TO STRIKE IMPROPERLY SUBMITTED LEGAL OPINION IS DENIED

After receiving the Specialist Firms' opposition to the motion for class certification,

CalPERS filed the instant Motion to Strike Improperly Submitted Legal Argument in Defendants' Appendix based on the assertion that the Appendix presents excerpts from trial and deposition testimony in such a way as to effectively continue its legal arguments beyond the page limit ordered by this Court.

■ In support of their respective positions on class certification, both CalPERS and the Specialist Firms have submitted hundreds of pages of testimony from related government trials and investigations. The Specialist Firms' Appendix contains excerpts organized by argument and contains brief summaries of the excerpted testimony. Nothing in the Appendix, however, rises to the level of legal argument, as the Court can easily distinguish (and just as easily disregard) the summaries providing context for the excerpts from the excerpts themselves. Because the Court finds that the Appendix does not constitute an impermissible continuation of the Specialist Firms' legal argument, CalPERS' motion is denied.

## IV. THE SPECIALIST FIRMS' MOTION TO STRIKE THE CORWIN AND CURTIN REPORTS IS DENIED

Following Lead Plaintiff's motion for class certification, the Specialist Firms moved to strike the Corwin and Curtin Reports. Given the degree to which Lead Plaintiff's motion for certification relies on these expert opinions, the motion to strike will be considered before turning to the motion for class certification.

### The Applicable Legal Standard

The admissibility of expert testimony is governed by the Federal Rules of Evidence as well as the Supreme Court's decisions in *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), and its progeny. Fed. R.Evid. 702 states:

If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if

■ the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

In *Daubert,* the Supreme Court assigned "to the trial judge the task of ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." *Daubert,* 509 U.S. at 597, 113 S.Ct. 2786; *see Kumho Tire Co., Ltd. v. Carmichael,* 526 U.S. 137, 147–49, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999) (applying *Daubert* to all expert testimony, not just testimony based on "scientific" knowledge).

■ In considering the reliability of expert testimony, courts may consider whether an expert's theory can be tested, "whether the theory or technique has been subjected to peer review and publication," "the known or potential rate of error", and "general acceptance." *Daubert,* 509 U.S. at 593–94, 113 S.Ct. 2786. However, this "list of factors was meant to be helpful, not definitive," and "neither necessarily nor exclusively applies to all experts or in every case." *Kumho Tire,* 526 U.S. at 141, 151, 119 S.Ct. 1167; *see Amorgianos v. Nat'l R.R. Passenger Corp.,* 303 F.3d 256, 266 (2d Cir.2002) ("[T]he *Daubert* inquiry is fluid and will necessarily vary from case to case.").

■ "While the proponent of expert testimony has the burden of establishing by a preponderance of the evidence that the admissibility requirements of Rule 702 are satisfied, the district court is the ultimate 'gatekeeper.'" *United States v. Williams,* 506 F.3d 151, 160 (2d Cir.2007) (internal citation omitted). Although a court is directed to exercise its discretion, "[t]he Rule's basic standard of relevance ... is a liberal one." *Daubert,* 509 U.S. at 587, 113 S.Ct. 2786. As the Advisory Committee notes, "[a] review of the caselaw after *Daubert* shows that the rejection of expert testimony is the exception rather than the rule." Fed.R.Evid. 702, Advisory Committee Notes.

■ The instant motion to strike comes to the Court not during a full-scale inquiry into the merits, but at the class certification

stage. Although often involving overlapping facts and arguments, "a motion to strike expert evidence pursuant to *Daubert* ... involves a inquiry distinct from that for evaluating expert evidence in support of a motion for class certification ...." *In re Visa Check/MasterMoney Antitrust Litig.*, 280 F.3d 124, 132 n. 4 (2d Cir.2001) (internal citation omitted). Even after the Court of Appeals' decision in *In re Initial Pub. Sec. Litig.*, 471 F.3d 24 (2d Cir.2006) ("In re IPO"), which requires courts to evaluate all questions of fact that pertain to class certification, even to the extent that such facts overlap with the merits, the proper role for a *Daubert* inquiry at the class certification stage remains limited by Rule 23 itself. At this stage, "the Court may only examine the expert reports as far as they bear on the Rule 23 determination," *Hnot v. Willis Group Holdings Ltd.*, 241 F.R.D. 204, 210 (S.D.N.Y.2007). Accordingly, this Court's *Daubert* inquiry is limited to whether or not the Corwin and Curtin Reports are admissible to establish the requirements of Rule 23.

### *The DOJ Algorithm*

In connection with the SEC's investigations of the Specialist Firms, the NYSE designed and created a computer algorithm to identify specific stock transactions where specialists had traded ahead of public orders, interpositioned themselves between public orders, and failed to execute public limit orders by trading for their own personal accounts. OCIE Rep. at 21. In addition to identifying individual violations, often referred to as "exceptions," the algorithm also identified the number of disadvantaged shares and disadvantaged dollar amounts. *See* Fund Administrator's Modified Fund Distribution Plan ("Distribution Plan") at 5, Pl.Ex. 20. The same algorithm was used, with minor modifications, in the DOJ's criminal investigations of the individual specialists (the "DOJ Algorithm").

The DOJ Algorithm utilizes two parameters designed to ensure accurate reporting of priority rule violations. First, it includes what OCIE refers to as a "freeze parameter." This parameter limits exceptions to trades that occurred between orders having identical Display Book times. Because of the way the Display Book operates, the only time that a given order would appear simultaneously on the Display Book is when the Display Book is frozen by the specialist, often while a clerk is reporting a trade, and orders queued off-screen. OCIE Rep. at 22. According to OCIE, the original purpose of this particular parameter was "to prevent the specialist from being able to argue that he had verbally given the clerk instructions to execute the first order prior to the second contra-side order arriving to the Display Book." *Id.* at 21.

The second parameter in the DOJ Algorithm limits trading ahead exceptions to those proprietary trades that occur more than ten seconds after the public order first appears on the Display Book. This ten-second lag provides for the situation where a specialist "verbally trades with the crowd, and it takes the clerk some amount of time before entering into report mode and freezing the Display Book." *Id.* at 16. The ten-second lag marks a departure from the NYSE's previous surveillance programs which allowed for a more generous 60–second lag. *Id.* at 15.

### *The Expert Reports*

In support of its motion for class certification, CalPERS submitted the Corwin Report, the Rebuttal Report of Corwin ("Corwin Rebuttal"), the Curtin Report, and the Rebuttal Report of Curtin ("Curtin Rebuttal"). The Corwin Report reviews and assesses the results produced by the DOJ Algorithm and analyzes whether implementing alterations to the DOJ Algorithm could "more accurately identify violative conduct." Corwin Rep. at 1. The Curtin Report then uses the NYSE data for 55 representative stocks during the Class Period to implement Corwin's recommended modifications. Curtin Rep. at 3. The Corwin and Curtin Rebuttals were submitted in response to the Specialist Firms' opposition to class certification, and specifically address critiques submitted to the Court by the Specialist Firms' expert, Dr. Mukesh Bajaj. *See* Baja Decl.

The Corwin Report concludes that:
"the general methodology used [in the DOJ Algorithm] to identify trading violations is appropriate and that the algorithm

identifies significant numbers of disadvantaged orders during the period from 1999 through 2003. However ... several of the parameters used in the DOJ algorithm resulted in a failure to identify the many cases of interpositioning and trading ahead by NYSE specialists. As a result, the disadvantaged dollar amounts based on the application of the DOJ's algorithm were significantly understated."

Corwin Rep. at 2. Corwin describes two changes which, when applied to the DOJ Algorithm, he asserts more accurately capture and identify interpositioning and trading ahead violations.

First, Corwin eliminates the requirement in the DOJ Algorithm that only orders that arrive on the Display Book during a "freeze" are marked as interpositioning exceptions. *Id.* 8 at 10. According to Corwin, "[i]f both orders are visible on the Display Book prior to the first specialist trade, interpositioning would result regardless of whether or not the orders arrived during a freeze." *Id.* Based on this logic, Corwin eliminates the "freeze" restriction from the DOJ Algorithm.

Second, Corwin reduces the lag-time parameter in the DOJ Algorithm from ten seconds to one second. Corwin cites OCIE's determination, based on interviews with specialists and specialist clerks from each of the seven firms, that "it is extremely rare for the clerk to enter into report mode [at which time the Display Book is frozen and a customer order cannot arrive at the specialist's post] more than two to three seconds after the specialist instructs the clerk to do so." OCIE Rep. at 16. Accordingly, Corwin concludes that "[t]he 10–second lag applied in the identification of trading ahead violations appears to be a remnant of surveillance parameters in use at the NYSE for many years." Corwin Rep. at 14. Based on his belief that the specialist "should be aware of executable orders on the Display Book almost immediately after their arrival," Corwin's algorithm reduces lag-time to at least one second. *Id.* at 15.

In addition, Corwin makes two minor adjustments to the DOJ Algorithm in order to correct what he calls "bugs" in that code. These modifications result in a 0.5% decrease

in identified interpositioning and trading ahead exceptions and a 0.5% decrease in the total disadvantaged dollar amount relative to the DOJ Code. *Id.* at 6 n. 6.

According to Corwin, the adjusted algorithm can be applied to any NYSE stock for any date, including the full set of NYSE stocks traded between 1999 and 2003. *Id.* at 2.

***Discussion***

The Specialist Firms contend that the Corwin and Curtin Reports are inadmissible under *Daubert* for several reasons. First, they argue that the Corwin Report constitutes inadmissible legal opinion concerning market practices that Corwin is unqualified to assess. According to the Specialist Firms, Corwin's modifications to the DOJ Algorithm are based on an invalid legal interpretation of the NYSE Rules involving the precise moment a trade is executed. Despite the Specialist Firms' arguments, however, Corwin has not offered any legal opinion as to how this Court should apply the NYSE Rules to the Specialist Firms in this case.

In rendering his opinion regarding the accuracy of the DOJ Algorithm, Corwin considered the interpretations of NYSE personnel, as reflected in the OCIE Report, and came to his own conclusions regarding the most accurate way to interpret the NYSE data. The notion, however, that in so doing, Corwin necessarily offers a legal opinion as to when under NYSE Rules a trade occurs ignores the fact that the original ten-second parameter used in the DOJ Algorithm was itself modeled on a 60–second lag, the length of which was based on interviews with specialists and designed to foreclose certain defenses involving oral trades. *See* OCIE Rep. at 1516. In his report, Corwin looks to the same sources to determine that a ten-second lag is overly conservative. Put simply, Corwin's task requires him to make choices about what parameters to apply to the data, choices that he is competent to make given his extensive experience with this type of data. *See* Corwin Rep. at 1.

The Specialist Firms cite *Marx & Co., Inc. v. Diners' Club Inc.*, 550 F.2d 505 (2d Cir.1977), as an example of impermissible

legal opinion in the securities context. In *Marx*, the Court of Appeals held that the district court erred in admitting expert testimony regarding the legal standards, derived from contract, governing the defendant's conduct. *See id.* at 508–09. By contrast, in this case, Corwin does not draw any conclusions as to whether the Specialist Firms engaged in conduct in violation of the federal securities laws or the NYSE Rules. Rather, the Corwin Report describes the DOJ's methodology for identifying priority rule violations and proposes modifications that he believes will more accurately reflect violative conduct. Despite the Specialist Firms' arguments to the contrary, Corwin does not attempt to define what constitutes an exception. The fact that the NYSE Rules are used to support his conclusions, notably in response to the Specialist Firms' questioning, does not render the opinion inadmissible.

Once the Specialist Firms' characterization of the Corwin Report as a legal opinion is dispensed with, it becomes clear that Corwin's accomplishments render him qualified to analyze and interpret NYSE data of the type used in his report. Corwin is the Viola D. Hank Associate Professor of Finance at the Mendoza College of Business at the University of Notre Dame. His research focuses primarily on the structure of financial markets and has been published in, *inter alia,* the *Journal of Finance,* the *Journal of Financial Markets,* and *Financial Management. See* Corwin Rep., App. A. In addition to his academic work, Corwin serves on the NASDAQ Economic Advisory Board and has served as a consultant to the NYSE. *Id.* He is qualified to provide his expert opinion in the instant motion.

The Specialist Firms next attack the Corwin Report on the grounds that it is not reliable under *Daubert* because it: 1) is based on incorrect facts; 2) is tailor-made for litigation and is not the product of reliable principles; and 3) does not apply methods reliably.

■ The Specialist Firms base their attack on the reliability of the Corwin Report primarily on Corwin's statements that NYSE trades are complete for purposes of the priority rules when they are reported, rather than when they are orally consummated. However, as Corwin's algorithm is based on the DOJ Algorithm, a disagreement over the proper role of "oral consummation" is insufficient to deem the entire report unreliable under *Daubert.* While the Specialist Firms may object to the one-second lag adjustment and dispute whether this parameter properly reflects NYSE practice, a disagreement with an expert is not a legitimate basis on which to strike that expert's opinion. *See Daubert,* 509 U.S. at 595, 113 S.Ct. 2786 ("The focus ... must be solely on principles and methodology, not on the conclusions that they generate."); *Amorgianos,* 303 F.3d at 266 ("[T]he district court must focus on the principles and methodology employed by the expert, without regard to the conclusions the expert has reached or the district court's belief as to the correctness of those conclusions.").

■ Neither does the fact that the DOJ Algorithm was modified specifically for this litigation render the Corwin Report inadmissible. Although a court may consider whether an expert's opinion or theory was developed specifically for the litigation at hand, *see e.g., In re Rezulin Prods. Liab. Litig.,* 369 F.Supp.2d 398, 420 (S.D.N.Y.2005), the reality of class action litigation dictates that many experts will be drawing conclusions and offering opinions based on a combination of past research and the unique circumstances of a given case. Here, Corwin has made adjustments to the DOJ Algorithm which both increase and decrease, albeit much more insubstantially, the number of disadvantaged trades. The fact that Corwin has adjusted the DOJ algorithm specifically to account for the circumstances described in the Amended Complaint does not, on its own, render the opinion inadmissible.

Finally, the Specialist Firms challenge the Corwin Report for failing to adequately account for obvious alternative explanations. *See, e.g., id.* ("Courts have considered ... whether the expert has accounted adequately for obvious alternative explanations."); *Israel v. Spring Industries, Inc.,* No, 98 Civ. 5106, 2006 WL 3196956, at *5 (E.D.N.Y. Nov.3, 2006) ("While an expert need not rule out every potential cause in order to satisfy *Daubert,* the expert's testimony must at least

address obvious alternative causes and provide a reasonable explanation for dismissing specific alternate factors identified by the defendant."). In objecting to the Corwin Report and the algorithm applied therein based on its inability to identify and address alternative explanations, the Specialist Firms largely mis-state the nature of the algorithm itself. In all three versions of the algorithm-the SEC, DOJ, and Corwin iterations each data point or trade passes through a series of filters and screens before being identified as an "exception." Although the Corwin Report reflects significant modifications to these filters, Corwin provides adequate explanations for each of the changes he imposes to the DOJ Algorithm to survive a *Daubert* challenge. Whether the filters fail to screen out some trades where alternative explanations would prevent recovery will be discussed in more detail below. For now, however, both the Corwin and Curtin Reports are admitted for the limited purpose of determining whether Rule 23 has been satisfied.

## V. CalPERS' MOTION FOR CLASS CERTIFICATION IS GRANTED

CalPERS has moved, pursuant to Rule 23, Fed.R.Civ.P., for an order certifying this consolidated action as a class action on behalf of all persons and entities who submitted orders (directly or through agents) to purchase or sell NYSE-listed securities during the Class Period, which orders were listed on the specialists' Display Book and subsequently disadvantaged by Defendants, and naming CalPERS and Market Street class representatives. Based on the following, the Court grants Lead Plaintiff's motion for class certification and names CalPERS and Market Street as class representatives.

### *The Applicable Legal Standard*

It is well established that "[c]lass certification is warranted under Rule 23 where the proposed class representative meets the standards of Rule 23(a) numerosity, commonality, typicality, and adequacy and the proposed class action meets the requirements of one of the subsections of Rule 23(b)." *In re Salomon Analyst Metromedia Litig.,* 544 F.3d 474, 478 (2d Cir.2008); see Fed.R.Civ.P. 23(a). Here, CalPERS seeks certification

under Rule 23(b) (3), which requires plaintiffs to demonstrate that "questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R.Civ.P. 23(b)(3).

As mentioned briefly above, the Court of Appeals recently clarified the standard by which a court in this district is to determine whether plaintiffs seeking class certification have met their Rule 23 burdens:

"(1) a district judge may certify a class only after making determinations that each of the Rule 23 requirements has been met; (2) such determinations can be made only if the judge resolves factual disputes relevant to each Rule 23 requirement and finds that whatever underlying facts are relevant to a particular Rule 23 requirement have been established and is persuaded to rule, based on the relevant facts and the applicable legal standard, that the requirement is met; (3) the obligation to make such determinations is not lessened by overlap between a Rule 23 requirement and a merits issue, even a merits issue that is identical with a Rule 23 requirement ...."

*In re IPO,* 471 F.3d at 41; see *Teamsters Local 445 Freight Div. Pension Fund v. Bombardier Inc.,* 546 F.3d 196, 202 (2d Cir. 2008) ("[In *In re IPO* w]e disavowed any implication in our earlier decisions that the 'some showing' standard may apply to Rule 23 issues and required district courts 'to assess all of the relevant evidence admitted at the class certification stage' ...").

■ While the Court of Appeals now requires district courts to dive deeper into the facts at the class certification stage, "the holdings of *In re IPO* are both significant and narrow-a district judge must consider all of the relevant evidence in determining whether Rule 23 has been satisfied, but a district judge may not go beyond the boundaries of Rule 23 when making such a determination." *Hnot,* 241 F.R.D. at 209.

### *The Rule 23(a) Requirements*

#### 1. Numerosity

■ The first prerequisite for class certification requires that the class be "so

numerous that joinder of all members is impracticable." Fed.R.Civ.P. 23(a)(1). Numerosity is presumed when a class consists of forty members or more. *Consol. Rail Corp. v. Town of Hyde Park,* 47 F.3d 473, 483 (2d Cir.1995). In securities class actions "relating to publicly owned and nationally listed corporations, the numerosity requirement may be satisfied by a showing that a large number of shares were outstanding and traded during the relevant period." *In re Vivendi Universal, S.A. Sec. Litig.,* 242 F.R.D. 76, 84 (S.D.N.Y.2007) (internal quotations and citation omitted).

During the proposed Class Period, the NYSE listed approximately 2,800 companies, and the average daily volume of all stocks traded was approximately 1,239,721,621 shares. *See* Pl.Ex. 46. In replicating the DOJ Algorithm for the 55 representative stock symbols for which CalPERS has data, it has already identified 1.1 million violative trade pairs. *See* Corwin Rep. at 5. Given that millions of trades of publicly-held stock occurred daily on the NYSE, and that the Specialist Defendants have not challenged numerosity, Lead Plaintiffs have established that the proposed class satisfies the numerosity requirement and that joinder is impracticable.

**2. Commonality**

■ To establish commonality, a plaintiff must demonstrate that "there are questions of law or fact common to the class." Fed. R.Civ.P. 23(a)(2). "The commonality requirement is met if plaintiffs' grievances share a common question of law or fact. Even a single common legal or factual question will suffice." *Freeland v. AT & T Corp.,* 238 F.R.D. 130, 140 (S.D.N.Y.2006) (internal quotations and citations omitted).

Lead Plaintiff alleges that questions of law and fact common to the class include:
(1)whether Defendants implemented manipulative acts, devices or contrivances or engaged in the alleged fraudulent scheme and course of business; (2) whether Defendants omitted material facts and concealed material information regarding the trading practices of the Specialist Firms; (3) whether Defendants violated the Ex-

change Act; (4) whether Defendants knew or recklessly disregarded that the allegedly false statements and omissions made by the them and others participating in the scheme were false and misleading; (5) whether the trading prices of shares purchased and sold were artificially manipulated and/or distorted by Defendants' conduct; and (6) the extent of damage sustained by class members and the appropriate measure of damages.
*See* Am. Compl. ¶ 26.

The Court agrees with CalPERS that, at this stage, it has demonstrated that these issues are common to the class. *See Freeland,* 238 F.R.D. at 140 (finding commonality requirement satisfied while noting that the predominance requirement of Rule 23(b)(3) is more stringent and "therefore more often the focus of contention when there is a motion to certify a damages class"). Again, the Specialist Firms have not argued that CalPERS' allegations would not support a finding of commonality in this case, and accordingly, commonality is established.

**3. Typicality**

■ Similarly, Rule 23(a)(3)'s typicality requirement is satisfied when "each class member's claim arises from the same course of events, and each class member makes similar legal arguments to prove the defendant's liability" *Robinson v. Metro–North Commuter R.R. Co.,* 267 F.3d 147, 155 (2d Cir.2001) (internal quotation and citation omitted). "[T]he requirements of commonality and typically 'tend to merge' because '[b]oth serve as guideposts for determining whether ... the named plaintiff's claim and the class claims are so inter-related that the interests of the class members will be fairly and adequately protected in their absence.'" *Velez v. Novartis Pharm. Corp.,* 244 F.R.D. 243, 257 (S.D.N.Y.2007) (quoting *Gen. Tel. Co. of Southwest v. Falcon,* 457 U.S. 147, 157 n. 13, 102 S.Ct. 2364, 72 L.Ed.2d 740 (1982)) (alterations in original). "The crux of both requirements is to ensure that maintenance of a class action is economical and that the named plaintiff's claims and the class claims are so interrelated that the interests of the class members will be fairly and adequately

protected in their absence." *Marisol A. v. Giuliani*, 126 F.3d 372, 376 (2d Cir.1997).

Although "the mere existence of individualized factual questions with respect to the class representative's claim will not bar class certification, class certification is inappropriate where a putative class representative is subject to unique defenses which threaten to become the focus of the litigation." *Baffa v. Donaldson, Lufkin & Jenrette Sec. Corp.*, 222 F.3d 52, 59 (2d Cir.2000) (internal quotations and citations omitted). "The unique defense rule, however, is not rigidly applied in this Circuit," and is "intended to protect plaintiff class-not to shield defendants from a potentially meritorious suit." *In re Parmalat Sec. Litig.*, No. 04 MD 1653(LAK), 2008 WL 3895539, at *5 (S.D.N.Y. Aug.21, 2008) (internal quotations and citations omitted).

In this case, Lead Plaintiff seeks certification of a class consisting of all persons and entities who submitted orders to purchase or sell NYSE-listed securities during the Class Period, which orders were listed on the specialists' Display Book and subsequently disadvantaged by Defendants. All members of the proposed class allege injuries resulting from the Specialist Firms' improper trading ahead and interpositioning, including CalPERS and Narket Street.

However, the Specialist Firms contend that CalPERS and Market Street are atypical of other members of the class. They first argue that since neither CalPERS nor Market Street has submitted evidence of any disadvantaged trades, other than those already covered by the regulatory settlements, they have not met their burden of establishing that they are members of the class that they seek to represent. *See Cordes & Co. Fin. Servs., Inc., v. A.G. Edwards & Sons, Inc.*, 502 F.3d 91, 99 (2d Cir.2007) ("To have standing to sue as a class representative it is essential that a plaintiff ... be a part of that class, that is, he must possess the same interest and suffer the same injury shared by all members of the class he represents." (internal quotations and citation omitted)).

This argument is unavailing in its attempt to portray CalPERS and Market Street as atypical class members. Both CalPERS and Market Street purchased and sold millions of shares of stock on the NYSE during the Class Period. *See* CalPERS Certification, Pl.Ex. 49; Cheseldine Decl. ¶ 2. And like all class members, CalPERS and Market Street rely on the DOJ Algorithm, as modified by Corwin, to identify priority rule violations. Given the unique circumstances of this purported securities class action, and the fact that at this time, data has only been obtained by Lead Plaintiff for 55 representative stocks, CalPERS and Market Street's failure to point to specific violative trades beyond those identified in the SEC's investigation is not fatal to its motion for certification. The purpose of the Rule 23(a) typicality requirement is to ensure that a class representative has "the incentive to prove all the elements of the cause of action which would be presented by the individual members of the class were they initiating individualized actions." *In re NASDAQ Market–Makers Antitrust Litig.*, 172 F.R.D. 119, 126 (S.D.N.Y.1997) (internal quotation and citation omitted). Indeed, CalPERS and Market Street's inability to definitively identify exceptions absent the full NYSE data for the Class Period demonstrates their typicality.

The Specialist Firms also argue that both CalPERS and Market Street are subject to unique defenses. By identifying several unique defenses to which the proposed class representatives might be subject, the Specialist Firms seek to differentiate CalPERS and Market Street from the rest of the class. It is, therefore, necessary to examine these defenses to determine whether either threatens "to become the focus of the litigation." *Baffa*, 222 F.3d at 59.

First, the Specialist Firms allege that since CalPERS evaluates quality of execution by measuring the volume-weighted average price ("VWAP") of each order, CalPERS is subject to a unique defense from those Specialist Firms with an affiliate brokerage service used by CalPERS, namely Goldman Sachs, Bear Stearns, and Fleet. These Specialist Firms, the argument goes, had incentives to provide best execution to CalPERS in order to increase the ranking of their affiliate brokers. The Specialist Firms

also argue that by relying on the VWAP, CalPERS "was not sensitive to minor variations in execution quality, unlike class members who did not depend on VWAP." Bajaj Decl. ¶ 112.

Notably, however, the Specialist Firms have cited no cases in support of the purported significance of CalPERS's strategy on this case. The fact that CalPERS relies on a particular benchmark to evaluate trades does not lead to the conclusion that CalPERS has less of an interest than other class members in demonstrating that the Specialist Firms violated their obligations. Neither does CalPERS' use of a particular trading strategy threaten to become the focus of this litigation.

■ With respect to Market Street, the Specialist Firms allege that Market Street is subject to a statute of limitations defense on inquiry notice grounds because of a statement made by the firm's president, Stephen Cheseldine, that he suspected that NYSE specialists were not executing its trades in compliance with the priority rules. Cheseldine Dep., Vol. II, at 211, Def. Ex. B326.

■ In the securities fraud context, inquiry notice exists "when a reasonable investor of ordinary intelligence would have discovered the existence of the fraud." *Dodds v. Cigna Sec., Inc.*, 12 F.3d 346, 350 (2d Cir.1993); *see also December 2005 Opinion*, at 312 n. 13. Standing alone, Cheseldine's statement that he had "certainly wondered why [he] didn't get certain trades," Cheseldine Dep., at 211, is not enough to put him on inquiry notice of wrongdoing, and the Specialist Firms have not alleged any additional facts that would indicate that, at this time, Market Street is susceptible to a statute of limitations defense that would threaten to become the focus of this litigation. *See In re Parmalat*, 2008 WL 3895539, at *5 (stating that "a representative may satisfy the typicality requirement even though that party may later be barred from recovery by a defense particular to him that would not impact other class members") (internal quotations and citation omitted).

Finally, defendants argue that Market Street does not satisfy the typicality require-

ment because it is a market maker whose purchases and sales of securities were conducted almost exclusively to hedge its options positions. Citing cases from outside this District, the Specialist Firms argue that courts routinely reject attempts by market makers to serve as class representatives. *See Tice v. Novastar Fin., Inc.*, No. 04–0330–CV, 2004 WL 1895180, at *5 (W.D.Mo. Aug.23, 2004) ("Courts have found market makers to be atypical of a class because they are subject to unique defenses regarding their reliance, or lack thereof, on the alleged fraud."); *Seamans v. Aid Auto Stores, Inc.*, No. 98–CV–7395, 2000 WL 33769023, *4 (E.D.N.Y. Feb.15, 2000) (finding market maker atypical of class); *Queen Uno Ltd. P'ship v. Coeur D'Alene Mines Corp.*, 183 F.R.D. 687, 692 (D.Colo.1998) (concluding that market marker could not serve as class representative where it was alleged that proposed class representative traded in defendant's stock because of its obligation to do so as market maker on the Chicago Board of Trade).

■ In this District, however, the fact that Market Street has sold securities to hedge its portfolio does not preclude it from representing other buyers. To the contrary, it is recognized that "where the public market of a quoted security is polluted by false information, or where price, supply and demand are distorted as a result of misleading omissions, all types of investors are injured[,]" including market makers. *In re Oxford Health Plans, Inc., Sec. Litig.*, 199 F.R.D. 119, 124 (S.D.N.Y.2001) (internal quotations and citation omitted). Concerns involving market makers and unique defenses are even less relevant here since, unlike in the cases cited by the Specialist Firms, Market Street is only registered as a market maker on the Philadelphia Exchange, and therefore it trades solely for its own account in transactions involving the Specialist Firms on the NYSE. *See* Cheseldine Dep., Vol. I, at 26–27, Pl.Ex. N.

"As long as plaintiffs assert, as they do here, that defendants committed the same wrongful acts in the same manner, against all members of the class, they establish [the] necessary typicality." *In re Towers Fin. Corp., Noteholders Litig.*, 177 F.R.D. 167,

170 (S.D.N.Y.1997) (internal quotation marks and citation omitted); *see Robidoux v. Celani,* 987 F.2d 931, 936–37 (2d Cir.1993) ("When it is alleged that the same unlawful conduct was directed at or affected both the named plaintiff and the class sought to be represented, the typicality requirement is usually met irrespective of minor variations in the fact patterns underlying individual claims."). Since the Specialist Firms have presented no evidence that CalPERS and Market Street allege different wrongful conduct or are subject to unique defenses that render them atypical of other class members, the typicality requirement is satisfied.

### 4. Adequacy of Representation

 The final requirement of Rule 23(a) is adequacy of representation, necessitating a showing that "the representative parties will fairly and adequately protect the interests of the class." Fed.R.Civ.P. 23(a)(4). "[A]dequacy of representation entails inquiry as to whether: 1) plaintiff's interests are antagonistic to the interest of other members of the class and 2) plaintiff's attorneys are qualified, experienced and able to conduct the litigation." *Baffa,* F.3d at 60. The analysis focuses on whether the proposed class representatives possess "the same interest and suffer the same injury as the class members." *Amchem Prods. v. Windsor,* 521 U.S. 591, 625–26, 117 S.Ct. 2231, 138 L.Ed.2d 689 (1997) (internal quotations and citation omitted). The focus is on uncovering "conflicts of interest between named parties and the class they seek to represent." *Id.* at 625, 117 S.Ct. 2231.

The Specialist Firms contend that "fundamental" conflicts within the purported class render it uncertifiable. *See In re Visa,* 280 F.3d at 145 (2d Cir.2001) ("The conflict that will prevent a plaintiff from meeting the Rule 23(a)(4) prerequisite must be fundamental . . . ." (internal quotations and citation omitted)). Defendants raise three potential conflicts: 1) between buyers and sellers with respect to the "interpositioning" claim; 2) between buyers and sellers regarding whether a trade is characterized as "interpositioning" or "trading ahead;" and 3) between buy-

ers and sellers related to the allocation of injury among class members.

 None of the various conflicts cited by the Specialist Firms defeat Lead Plaintiff's showing of adequacy. Both CalPERS and Market Street have raised claims typical of those of the other class members in that they arise due to the Specialist Firms' alleged manipulative stock trading activities and false statements and are based on identical legal and remedial theories. Further, they assert identical harm, regardless of whether the violative trades involved purchases or sales of stock. Despite the Specialist Firms' arguments to the contrary, the mere presence of purchasers and sellers in a given class does not provide a basis for denying class certification unless the "asserted 'conflict' is so palpable as to outweigh the substantial interest of every class member in proceeding with the litigation." *In re NASDAQ Market–Makers Antitrust Litig.,* 169 F.R.D. 493, 514–15 (S.D.N.Y.1996). The Specialist Firms have not shown that such a conflict exists in this case.

The Specialist Firms cite *United Egg Producers v. Bauer Int'l Corp.,* 312 F.Supp. 319 (S.D.N.Y.1970), for the proposition that buyer-seller conflicts necessarily create irreconcilable conflicts for putative class representatives seeking to represent both. However, in *United Egg,* the defendant-counterclaimant seeking to represent "all consumers of eggs in the United States who are similarly situated" against a cooperative of egg producers was also an importer and supplier of eggs. Based on its conclusion that Bauer's "first allegiance is not to consumers but to himself as an importer and supplier of eggs," the court found Bauer an inadequate class representative. *See id.* at 321. Here, both proposed class representatives engaged in trades during the Class Period as both buyer and seller. There is no evidence that either CalPERS or Market Street has any "allegiance" that would prevent it from serving as class representative.

The Specialist Firms next argue that class members here will inevitably conflict over the characterization of individual trades as "interpositioning" or "trading ahead," and that this conflict will prove insurmountable.

Conflicts over the characterization of harm ultimately implicate the allocation of injury and damages, essentially boiling down to who suffered injury and how much. Conflicts over damages, at this early stage in the litigation, need not defeat a motion for certification. *See, e.g., In re WorldCom,* 219 F.R.D. at 302 ("When liability can be determined on a class-wide basis, individualized damage issues are not ordinarily a bar to class certification.").

■ The Specialist Firms' argument that since ascertaining members of buyer/seller sub-classes is impracticable at this stage, class certification should be denied also misses the mark. If, in the future, it becomes clear that intra-class conflicts related to damages require the creation of sub-classes, then the Court will address the issue at that time. "To the extent that different formulas may apply to the calculation of any damages suffered ... this Court can order certification of appropriate sub-classes at a later juncture within its broad discretion in arranging the structure of a class action litigation ...." *Constance Sczesny Trust v. KPMG LLP,* 223 F.R.D. 319, 325 (S.D.N.Y.2004); *see, e.g., In re Austrian & German Bank Holocaust Litig.,* 317 F.3d 91, 103–04 (2d Cir.2003) ("In some circumstances a court itself might well have an obligation on its own motion, especially when called upon to approve a class action settlement, to designate a subclass and assure proper representation for the subclass, or to take other appropriate steps to lessen if not eliminate the potential for a conflict among class members.").

■ Finally, the Specialist Firms argue that Market Street is an inadequate class representative because it is already overburdened by numerous lawsuits in which it serves as plaintiff. In challenging the adequacy of Market Street to serve as class representative, the Specialist Firms rely on a comment made by Cheseldine that he spends "[t]oo much" time a week on litigation. Cheseldine Dep. at 254, Def. Ex. B349. Accordingly to the Specialist Firms, Cheseldine also had difficulty recalling the full number and details of cases in which Market Street currently serves as a plaintiff. *See id.* at 247–48, 250–70.

■ However, "named plaintiffs are not expected to possess expert knowledge of the details of the case and must be expected to rely on expert counsel." *Baffa,* 222 F.3d at 61. Only "where the class representatives have so little knowledge of and involvement in the class action that they would be unable or unwilling to protect the interests of the class against the possibly competing interests of the attorney" may a court deny class representative status. *Id.* (internal quotations and citation omitted). Here, the Specialist Firms' allegations that Market Street's president is overburdened by litigation are not supported by sufficient evidence for the Court to conclude that Market Street is not an adequate class representative.

As to the second prong, the Specialist Firms have not challenged, in this motion, the qualifications, experience, or ability of counsel for Lead Plaintiff, Coughlin Stoia Geller Rudman & Robbins LLP ("Coughlin"), to conduct this litigation. Given Coughlin's substantial experience in securities class action litigation and the extensive discovery already conducted in this case, this element of adequacy has also been satisfied.

### The Rule 23(b)(3) Requirements: Predominance and Superiority

Once a party has demonstrated, by a preponderance of the evidence, that the requirements of Rule 23(a) have been established, the Court must then turn to Rule 23(b) and determine whether plaintiff meets the requirements of one of its sub-sections. Here, CalPERS seeks certification under Rule 23(b)(3), which provides that a suit may be maintained as a class action if "the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed.R.Civ.P. 23(b)(3).

### 1. Predominance

■ "The Rule 23(b)(3) predominance inquiry tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Amchem Prods.,* 521 U.S.

at 623, 117 S.Ct. 2231. It is "more demanding than the commonality determination required by Rule 23(a)," *In re WorldCom*, 219 F.R.D. at 279, and requires that issues that are subject to generalized proof outweigh those subject to individualized proof. *See Heerwagen v. Clear Channel Commc'ns*, 435 F.3d 219, 226 (2d Cir.2006).

At the same time, predominance does not require a plaintiff to show that there are no individual issues. *See Dura–Bilt Corp. v. Chase Manhattan Corp.*, 89 F.R.D. 87, 99 (S.D.N.Y.1981) ("[I]ndividual issues will likely arise in this as in all class action cases. But, to allow various secondary issues of plaintiffs' claim to preclude certification of a class would render the rule an impotent tool for private enforcement of the securities laws."). Indeed, "[p]redominance is a test readily met in certain cases alleging . . . securities fraud." *Amchem Prods.*, 521 U.S. at 625, 117 S.Ct. 2231. In deciding whether the Rule 23(b)(3) elements have been satisfied, "the district court must make a 'definitive assessment of Rule 23 requirements, notwithstanding their overlap with merits issues.'" *Cordes & Co.*, 502 F.3d at 108 (quoting *In re IPO*, 471 F.3d at 41).

In its Amended Complaint, CalPERS alleges that the Specialist Firms violated Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 and Rule 10b–5 promulgated thereunder. To succeed on its 10(b) claims, CalPERS must establish the following four elements: 1) a material misrepresentation or omission, or a manipulative or deceptive act; 2) scienter; 3) causation, including reliance; and 4) economic loss or injury. *See Stoneridge Inv. Partners, LLC v. Scientific–Atlanta*, 552 U.S. 148, 128 S.Ct. 761, 768, 169 L.Ed.2d 627 (2008). In addition to establishing a primary 10(b) violation, CalPERS' Section 20(a) claims require proof of control by the defendant over the primary violator. *See In re Parmalat Sec. Litig.*, 376 F.Supp.2d 472, 515 (S.D.N.Y.2005).

### 1. Deceptive or Manipulative Act/Misstatement

The Amended Complaint alleges that the Specialist Firms engaged in priority rule violations that were "deceptive" under 10b–5(a) and (c), and rendered certain statements made by the Specialist Firms regarding priority execution false under 10b–5(b). CalPERS contends that its surveillance software, discussed in more detail above, is able to identify the Specialist Firms' illegal conduct in a uniform manner and can be used to determine whether illegal conduct occurred without necessitating a trade-by-trade review.

According to the Specialist Firms, proof of each alleged priority rule violation turns on facts specific to each individual trade, including when the order arrived on the Display Book, when and how the trade was executed, and whether the trade was reported by the clerk in order to correct a prior error. The Specialist Firms' argument is based on the notion that a trade that occurs on the NYSE floor, rather than through the SuperDOT system, is executed not when it is entered into the Display Book, but when it is "orally consummated." The Specialist Firms have submitted deposition testimony and testimony from the government trials to support their argument. For example, Edward Kwalwasser, Executive Vice President of the NYSE Regulatory Group, describes the way in which an oral trade is executed as follows:

Q. When is the trade consummated?

A. When the specialist says done.

Q. The specialist says done after he's gotten the terms of the orders and the badge numbers?

A. No.

Q. So explain that clearly to us?

A. There are [sic] a specialist is offering a half million shares, there are people who want to buy a half million shares, they all indicate to him that they want to buy the stock at 16, let's pick a number. He will say "done."

Q. Okay.

A. He will then collect all of the information that he needs, because it's important to get the trade done because the market is moving . . . So the specialist will then get the badge numbers of the folks that he dealt with, and what the amount to make sure that I'm correct

... He then communicates that to his clerk.

Q. So that's after he said "done," he is then relaying the information to the clerk, and then what happens?

A. Then the clerk reports that trade to the tape and to the comparison settlement system and when the clerk finishes that report and presses done
....

Def. Opp. Br., App. at 1. Since oral trades are not recorded or reflected in the NYSE's data, oral consummation can lead to "false positives." As the witness quoted above testified: "The false positive are orders that had ... come in between the time that the specialist said 'done' and the time he collected the information that his clerk went into the report mode." *Id.* at 2. The Specialist Firms argue that Corwin's algorithm necessarily identifies false positives in these circumstances.[2] Any trade identified by the algorithm as an exception, then, would be open to a fact-specific defense that it was orally consummated and merely reflects the delayed reporting of such an oral execution. According to the Specialist Firms, the algorithm is incapable of weeding out such false positives on a class-wide basis.

CalPERS disputes not only the existence of the "oral consummation rule," but also the Specialist Firms' characterization of the way trades are conducted on the NYSE floor and reflected in the NYSE data. According to CalPERS, NYSE data records identify, to the fraction of a second, when a customer's electronic order arrives on the Display Book. *See* Corwin Rebuttal ¶ 4. For purposes of the algorithm, the time an order arrives on the Display Book is denoted as "DBTIME." *Id.* DBTIME is then compared to the time the transaction is electronically reported by the specialist into the Display Book ("RTIME"). Corwin's algorithm treats RTIME as equivalent to the time an order was executed, and

therefore, CalPERS asserts, provides an accurate data point on which to determine whether a priority rule violation occurred.

The evidence demonstrates that CalPERS is more than justified in equating RTIME with execution time to identify violative conduct on a class-wide basis. Indeed, the use of RTIME as execution time was adopted in the algorithms used by both the SEC and DOJ in their investigations.[3] *See* Corwin Rebuttal ¶ 10. Further, an NYSE programmer involved with the DOJ Algorithm testified, pursuant to a stipulation, in the government trials that RTIME is the time a transaction occurs and is executed in the Display Book. *See, e.g., United States v. Finnerty,* No. 05 Cr. 393 (S.D.N.Y. Oct. 23, 2006). Indeed, the Specialist Firms themselves rely on RTIME in data reports on execution quality. Corwin Rebuttal ¶ 7.

The Specialist Firms, on the other hand, rely on the testimony of specialists, clerks, and NYSE officials to prove the existence of the oral consummation rule. *See* Def. Opp. to Class Certification, App. They have, however, pointed to no NYSE rule recognizing or defining "oral consummation" in the way they suggest.

Without determining whether the oral consummation exists, the Court is convinced that CalPERS can identify violative using primarily common proof. Assuming that oral trades are executed at the time the deal is reached on the floor and not at the time the trade is electronically reported, oral trades represent a relatively small percentage of trades involving floor brokers. *See* Corwin Rebuttal ¶ 6. More importantly, however, the Specialist Firms have not convinced the Court that the algorithm CalPERS proposes cannot be adjusted to account for "oral consummation" or other similar issues. According to Corwin, the algorithm

---

**2.** This argument was anticipated by the NYSE and incorporated into the DOJ Algorithm in the form of the ten-second lag and freeze parameters. *See* OCIE Rep. at 16, 21 ("The Exchange chose to include orders with the same Display Book time to prevent the specialist from being able to argue that he had verbally given the clerk instructions to execute the first order prior to the

second contra-side order arriving to the Display Book.").

**3.** It must be noted, however, that the lag and freeze parameters, effectively eliminated in CalPERS' algorithm, minimized the significance of defining execution in this way in the SEC and DOJ investigations.

could easily be modified to account for "oral consummation" of trades, if necessary. All that would be required is an increase in the lag between system order display time and specialist trade time for the subset of orders involving a floor broker. The change in parameter values would in no way limit the ability of the algorithm to identify cases of interpositioning and trading ahead violations.

Corwin Rebuttal ¶ 11, n. 8.

The Specialist Firms counter that Cal-PERS' algorithm cannot be adjusted to account for several other problems with the NYSE data, including unreliable data points and hectic market conditions that lead to harmless errors. The Specialist Firms direct the Court's attention to an exception to NYSE Rule 92 which permits specialists to step ahead of public trade orders in order to correct "bona fide" errors, arguing that the algorithm mistakenly identifies such trades as exceptions.

The Court, does not, however, agree with the Specialist Firms that these concerns cannot be adequately addressed in the class action context. The fact that algorithm is potentially over-inclusive in identifying violative conduct does not, therefore, call into doubt the ability of CalPERS to identify violative transactions on a primarily class-wide basis. Indeed, the evidence presented by CalPERS shows that the Specialist Firms' claims of the extent to which harmless error can account for exceptions identified by the algorithm are exaggerated. Corwin's analysis suggests that these errors are "extremely rare." Corwin Rebuttal ¶ 13. The Specialist Firms, by contrast, have not identified what percentage of violations identified by the algorithm are the result of bona fide error.

Through use of the DOJ Algorithm, as modified by Corwin, CalPERS has demonstrated that it will be able to identify priority rule violations with common proof. Although the Specialist Firms raise several areas in which the proposed algorithm might be improved to eliminate the possibility of false positives, they have not demonstrated that individual issues will predominate on this initial element of CalPERS' 10(b)–5 claims.

## 2. Scienter

According to the Specialist Firms, Cal-PERS has failed to demonstrate how scienter can be established using evidence common to the putative class. Looking to the SEC and DOJ investigations, the Specialist Firms argue that since no scienter was alleged with respect to the majority of the trades flagged by the DOJ Algorithm, CalPERS will similarly be unable to establish scienter here.

CalPERS, however, has submitted sufficient evidence to demonstrate that it can prove scienter on a class-wide basis. This Court has previously held that the SEC settlement orders and the Complaint were "more than sufficient to support a strong inference that the Specialist Firms engaged in interpositioning and trading ahead with scienter throughout the Class Period." *December 2005 Opinion*, at 313–14. Unlike the government, CalPERS is not required to prove scienter for any one individual specialist. Rather, it must be able to prove that scienter existed on a firm-wide basis. To date, CalPERS has identified over four million priority rule violations by the Specialist Firms, and has submitted findings and testimony from both the SEC and government trials showing that high-level members of the Specialist Firms were not only aware of these violations, but instructed specialists to trade on the firms' principal account instead of matching public customer orders. *See e.g., United States v. Hayward,* No. 05 Cr. 390 (S.D.N.Y. June 27, 2006); Corwin Rebuttal ¶ 59.

Since CalPERS has presented sufficient evidence to indicate that it will be able to prove scienter on a class-wide basis, and the Specialist Firms have not convinced the Court otherwise, this element of Rule 23(b)(3) is similarly satisfied.

## 3. Reliance

As both parties recognize, the facts of this case are unusual in the securities fraud class action context. *See December 2005 Opinion*, at 315 (relying on observation that "the facts present here do not constitute the typical case" to distinguish *Dura Pharm., Inc. v. Broudo,* 544 U.S. 336, 125 S.Ct. 1627,

161 L.Ed.2d 577 (2005)). Rather than alleging wrongful conduct that resulted in the value of security being artificially inflated, the Specialist Firms are alleged to have profited from their position by trading for their own proprietary interest when federal securities law and the NYSE Rules required otherwise. Based on these unique circumstances, the Specialist Firms contend that CalPERS cannot prove reliance on a class-wide basis.

CalPERS claims that it can prove reliance with common proof. First, it invokes *Basic v. Levinson*, 485 U.S. 224, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988), for the presumption that all purchasers and sellers of securities rely on the efficiency of the market in making their trades. *See Gurary v. Winehouse*, 190 F.3d 37, 45 (2d Cir.1999) ("The gravamen of manipulation is deception of investors into believing that prices at which they purchase and sell securities are determined by the natural interplay of supply and demand, not rigged by manipulators."). Since the Amended Complaint alleges market manipulation, CalPERS argues, individual proof of reliance is not required. *See December 2005 Opinion*, at 319 ("Plaintiffs may be presumed to have relied upon information indicating that securities would be matched by specialists, as opposed to be bought and sold at artificially high and low prices.").

Second, in connection with its claims related to the Specialist Firms' misstatements, CalPERS argues, and this Court has previously agreed, that the fraud-on-the-market theory applies. *See Hevesi v. Citigroup Inc.*, 366 F.3d 70, 77 (2d Cir.2004) ("The fraud-on-the-market doctrine, as described by the Supreme Court in *Basic v. Levinson*, creates a rebuttable presumption that (1) misrepresentations by an issuer affect the price for securities traded in the open market, and (2) investors rely on the market price of securities as an accurate measure of their intrinsic value."); *see December 2005 Opinion*, at 319 ("Plaintiff's allegations fall within the fraud-on-the-market doctrine and reliance upon the alleged misrepresentations is presumed.").

Relying on dicta from the Court of Appeals' decision in this case, the Specialist Firms disagree with the Court's conclusion that the fraud-on-the-market theory applies.

In reversing this Court's order dismissing claims against the NYSE, the Court of Appeals wrote that, "Lead Plaintiffs' Rule 10b–5 claims do not appear to be of the nature where the fraud-on-the-market theory would apply, where the misrepresentation itself affects the market price of the security purchased." *In re NYSE Specialists*, 503 F.3d at 103. However, the Specialist Firms fail to acknowledge that the Court of Appeals' statements regarding reliance were in reference to Lead Plaintiffs' 10b–5 claims against the NYSE, not the Specialist Firms. Having remanded the issue of whether plaintiffs' 10b–5(b) claims against the NYSE should be dismissed for reasons other than lack of standing, the Court acknowledged that "[w]ithout a clear understanding as to what Lead Plaintiffs' theory of reliance is" it could not issue an opinion on the NYSE's other stated grounds for dismissal, namely whether CalPERS had sufficiently plead reliance on the NYSE's misstatements to sustain a claim against it. *Id.* at 102–03. These statements related to the applicability of the fraud-on-the-market theory of reliance solely involve 10b–5(b) claims against the NYSE are not relevant to any of the claims asserted against the Specialist Firms.

Still, the Specialist Firms urge this Court to reverse course and treat this action as a best execution case, rather a market manipulation case. The Specialist Firms rely on *Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 259 F.3d 154 (3d Cir.2001), to support their argument that individual issues will predominate. In *Newton*, plaintiffs alleged that defendants, broker-dealers on NASDAQ, violated their duty of best execution by failing to investigate feasible alternatives to the central system, thereby executing orders at unfavorable prices. There, the Court held that the fraud-on-the-market presumption did not apply because "plaintiffs' claims do not involve an omission or misrepresentation that affected the value of security." *Id.* at 175–76. Here, however, this Court has already determined that "the fraud-on-the-market doctrine is applicable to misstatements about specific securities as well as misstatements about the marketplace

for those securities." *December 2005 Opinion,* at 318.

According to the Specialist Firms, the relevant market for purposes of establishing reliance is not the NYSE, but the market for execution services. Citing *In re IPO,* they argue that the fraud-on-the-market presumption does not apply outside the limited context of statements by issuers concerning securities traded in an efficient market. *In re IPO,* 471 F.3d at 42–43. Denying class certification, the Court in *In re IPO,* however, held that plaintiffs could not establish a fraud-on-the-market theory of reliance because "the market for IPO shares is not efficient." *See In re IPO,* 471 F.3d at 42. By contrast, CalPERS has submitted sufficient evidence to establish that class members relied on the efficiency and fairness of the NYSE. *See, e.g.,* Am. Compl. ¶¶ 156, 157, 159, 163, 164, 170. The Specialist Firms, on the other hand, can point to no evidence that investors did not rely on specialists executing their trades on the NYSE in accordance with their obligations under the law.

The Specialist Firms rely heavily on *United States v. Finnerty,* 474 F.Supp.2d 530, 540 (S.D.N.Y.2007), and the district court's grant of a judgment of acquittal, as proof that individual issues will predominate in this case. In fact, the evidence indicates that the opposite is true. In *Finnerty,* the Honorable Denny Chin found that since the government had failed to present sufficient proof of customer expectations to establish that defendant Finnerty's acts were deceptive under 10(b), the jury's conviction could not stand. *See id.* at 540. ("Without evidence of what the customers expected, no rational juror could conclude that the interpositioning trades had a tendency to deceive or the power to mislead."). Judge Chin was, however, "clear" that "the Government is not required to call public customers as witnesses to prove their actual expectations. The Government can rely on other evidence, such as documents or other witnesses, to show what customers expected or believed when they dealt with specialists," citing with approval the newspaper articles, press releases, SEC filings, and promotional materi-

als submitted to this Court in the instant case. *Id.*

Although Finnerty involved proof of customer expectation in the context of deception, the same logic applies to establishing customer expectation in terms of reliance. Indeed, the Court of Appeals acknowledged the applicability of the fraud-on-the-market doctrine to the facts of *Finnerty,* noting that the "presumption of reliance arises where a civil plaintiff can point to 'public, material misrepresentations' that impugned the integrity of a stock's market price," while upholding the district court's judgment since "the government has attributed to Finnerty nothing that deceived the public or affected the price of any stock: no material misrepresentation, no omission, no breach of a duty to disclose, and no creation of a false appearance of fact by any means." *U.S. v. Finnerty,* 533 F.3d 143, 151 (2d Cir.2008) (quoting *Basic Inc.,* 485 U.S. at 248, 108 S.Ct. 978).

This Court has already held, and the government trials reinforce, that CalPERS can establish, on a class-wide basis, that class members relied on an efficient and fair market.

#### 4. Injury–in–Fact

Finally, the Specialist Firms argue that CalPERS cannot prove economic loss without establishing, trade-by-trade, whether the customer received the price he or she would have received "but for" the priority violation. Again relying on *Newton,* they argue that that proof of economic injury cannot be made on a class-wide basis. In *Newton,* the Third Circuit held that:

> In fraud-on-the-market cases, the price at which a stock is traded is presumably affected by the fraudulent information, thus injuring every investor who trades in the security.... Accordingly, presuming economic loss was the ineluctable by-product of the alleged fraud. The same does not hold true here. The execution of plaintiffs' trades at the NBBO listed price did not necessarily injure each class member. Plaintiffs may be entitled to a presumption of economic loss only when it is clear each class member has in fact sustained economic injury.

*Newton,* 259 F.3d at 179–80. Once it determined that a presumption of economic loss did not apply, the court went on to consider the myriad factors that would need to be considered to determine whether an individual class member indeed suffered damages. *See id.* at 187 (describing complicated factual inquires required to determine "whether a particular trade provided an investor with 'the best reasonably available price' " and listing other terms relevant to best execution inquiry, including order size, trading characteristics, speed of execution, clearing costs, and the cost and difficulty of executing an order in a particular market). Based on the court's conclusion that the "factors would appear to vary from class member to class member and, for each class member, from trade to trade," the court held that the "Herculean task, involving hundreds of millions of transactions, counsels against finding predominance." *Id.*

■ In this case, CalPERS does not ask the Court to apply any presumption of economic loss to its claims of market manipulation. Rather, CalPERS has established that it can prove economic loss through the application of its algorithm to the NYSE trading data for the Class Period. CalPERS also claims that it can ascertain, again using the algorithm, the price an investor would have received "but for" the Specialist Firms' alleged misconduct. *See* Corwin Rebuttal ¶¶ 62–67; *compare Newton,* 259 F.3d at 188 (denying certification where plaintiffs' expert merely "projected" that he could devise a formula to measure damages on a class-wide basis, rather than providing an actual formula).

While it is true that "[t]he ability to calculate aggregate amount of damages does not absolve plaintiffs from the duty to prove each investor was harmed by the defendants' practice," *Newton,* 259 F.3d at 189, plaintiffs have convinced this Court that common issues will predominate. "Even if the district court concludes that the issue of injury-in-fact presents individual questions, however, it does not necessarily follow that they predominate over common ones and that class action treatment is therefore unwarranted." *Cordes,* 502 F.3d at 108.

### Superiority

■ Under Rule 23(b)(3), a plaintiff must also demonstrate that "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed.R.Civ.P. 23(b) (3). The Rule lists several factors that are relevant to analyzing whether the class action device is a superior method:

> (A) the class members' interests in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already begun by or against class members; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; (D) the likely difficulties in managing a class action.

*Id.* This list is "nonexhaustive," *Amchem Prods.,* 521 U.S. at 615, 117 S.Ct. 2231, and "[c]ourts have long recognized that [c]lass actions are a particularly appropriate and desirable means to resolve claims based on the securities laws." *In re Veeco Instruments, Inc. Sec. Litig.,* 235 F.R.D. 220, 240 (S.D.N.Y.2006) (internal quotations and citations omitted). Accordingly, securities cases "easily satisfy the superiority requirement of Rule 23." *In re Blech Sec. Litig.,* 187 F.R.D. 97, 107 (S.D.N.Y.1999).

■ Each of the factors listed above weighs in favor of class certification. Here, class members have little or no interest in controlling the prosecution of separate actions. Indeed, the costs and expenses of such individual actions would be prohibitive. *See Korn v. Franchard Corp.,* 456 F.2d 1206, 1214 (2d Cir.1972) (describing one of chief goals of Rule 23 as protecting claimants whose "individual claims would be too small to justify separate litigation"). As for the second and third factors, this case has been pending since 2003, and since that time, several related cases have been consolidated before this Court. Class certification will also promote economy and uniformity of decisions by concentrating these consolidated litigations in a single forum.

Finally, there is no reason to expect any difficulties in the management of this class

action that would counsel against certification. The record before the Court includes prior findings by the SEC and NYSE, and the evidence presented by CalPERS in support of this motion suggests that the algorithm developed by the SEC and DOJ and modified by Lead Plaintiff can be utilized in this case to identify specific transaction where alleged wrongdoing occurred on a class-wide basis. CalPERS has further demonstrated that it will be able to rely on the database already developed by the SEC in conjunction with its own algorithm to ensure that there will be no double recovery for injured investors who recovered from the SEC's settlement.

Rather than dispute that these factors weigh in favor of class certification, the Specialist Firms point to the SEC investigation, characterizing the instant action as duplicative of that settlement, and assert that the extensive time and money already spent administering and distributing settlement funds counsel against class certification.

The Supreme Court has "long recognized that meritorious private actions to enforce federal antifraud securities laws are an essential supplement to criminal prosecutions and civil enforcement actions brought, respectively, by the Department of Justice and the [SEC]." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 127 S.Ct. 2499, 168 L.Ed.2d 179 (2007). Indeed, in this District, numerous securities class actions have been certified despite multi-million dollar settlements resulting from criminal and regulatory investigations. *See, e.g., In re Merrill Lynch & Co. Research Reports Sec. Litig.*, No. 02 MD 1484(JFK), 2007 WL 313474 (S.D.N.Y. Feb.1, 2007) (granting class certification following $100 million settlement with New York Attorney General's Office); *In re AOL Time Warner, Inc. Sec. & ERISA Litig.*, No. 02 Civ. 5575(SWK), 2006 WL 903236 (S.D.N.Y. Apr.6, 2006) (approving class action settlement following defendant's $300 million settlement with the SEC and $150 million settlement with the DOJ); *In re WorldCom*, 219 F.R.D. 267 (certifying class following partial settlement with the SEC for $2.25 billion, which was later reduced to $750 million). Further, although the Amended Complaint alleges the same wrongdoing on the part of the Specialist Firms as that alleged in the SEC investigation, the instant suit is not duplicative because, as this Court has already held, it only provides for relief for those violative transactions not yet accounted for. *December 2005 Opinion*, at 311.

Based on the above, the Court finds that a class action is the superior method for resolving CalPERS' claims and that Lead Plaintiff has satisfied its burden of establishing, by a preponderance of the evidence, that each of the Rule 23 requirements are satisfied in this case. Accordingly, CalPERS' motion for class certification is granted, CalPERS and Market Street are appointed class representatives, and the remaining motions are denied.

It is so ordered.