# United States Court of Appeals

### For the Eighth Circuit

_____

No. 18-3689

_____

Roderick Ford,

*Plaintiff   Appellee,*

v.

TD Ameritrade Holding Corporation; TD Ameritrade, Inc.; Frederic J. Tomczyk,

*Defendants   Appellants.*

------------------------------

Securities Industry and Financial Markets Association; Chamber of Commerce of
the United States of America,

*Amici on Behalf of Appellants,*

Better Markets, Inc.,

*Amicus on Behalf of Appellee.*

_____

Appeal from United States District Court
for the District of Nebraska - Omaha

_____

Submitted: September 23, 2020
Filed: April 23, 2021

_____

Before COLLOTON, GRUENDER, and GRASZ, Circuit Judges.
_____

COLLOTON, Circuit Judge.

A customer of TD Ameritrade, Inc., sued the company and two other defendants for securities fraud in the District of New Jersey. He purported to sue on behalf of himself and all similarly-situated customers of TD Ameritrade. The district court in New Jersey later appointed Roderick Ford as lead plaintiff, and the court then transferred the action to the District of Nebraska. The district court in Nebraska certified a class under Federal Rule of Civil Procedure 23(b)(3), and the defendants appeal that order. We conclude that the proposed class does not satisfy the requirements of Rule 23, and we therefore reverse.

I.

TD Ameritrade offers brokerage services to retail investors. The company is the nation's third largest discount brokerage, serving over six million clients. TD Ameritrade customers can trade stocks by submitting orders through the company's online platform. The company itself does not execute customer orders, but instead routes orders to trading venues (such as a stock exchange) for fulfillment. The company generally transmits orders using a computerized routing system.

Ford was appointed in 2014 as lead plaintiff for a group of investors who purchased and sold securities through TD Ameritrade between 2011 and 2014. He alleges that TD Ameritrade's order routing practices violate the company's "duty of best execution" by systematically sending customer orders to trading venues that pay the company the most money, rather than to venues that provide the best outcome for customers. The duty of best execution requires that brokers "use reasonable efforts to maximize the economic benefit to the client in each transaction." *Newton v.*

-2-

*Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 259 F.3d 154, 173 (3d Cir. 2001) (internal quotation omitted).

Ford maintains that TD Ameritrade caused customers to suffer economic loss by leaving orders unfilled, filling orders at a sub-optimal price, and filling orders in a manner that adversely affected performance after execution. The complaint asserts that TD Ameritrade, its parent company, and its chief executive officer, Frederic J. Tomczyk, violated § 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and the Securities and Exchange Commission's Rule 10b-5. 17 C.F.R. § 240.10b-5. The complaint also asserts that Tomcyzk is jointly and severally liable as a "controlling person" of the company under § 20(a) of the Act. 15 U.S.C. § 78t(a).

Ford moved for class certification in 2017. A magistrate judge concluded that the proposed class did not satisfy the requirements of Rule 23(b)(3) and recommended denying certification. The judge reasoned that determining whether each TD Ameritrade customer suffered economic loss as a result of the company's order routing practices would entail an order-by-order inquiry, and that common issues thus did not predominate over individual questions.

On review of the recommendation, however, the district court determined that Ford's expert had developed an algorithm that could solve the predominance problem by making automatic determinations of economic loss for each customer. The court certified a class consisting of "[a]ll clients of TD Ameritrade between September 15, 2011 and September 15, 2014 who placed orders that did not receive best execution, in connection with which TD Ameritrade received either liquidity rebates or payment for order flow, and who were thereby damaged."

This court granted the defendants permission to appeal the class certification order.  *See* Fed. R. Civ. P. 23(f).  We review the order for abuse of discretion.  *IBEW Local 98 Pension Fund v. Best Buy Co.*, 818 F.3d 775, 779 (8th Cir. 2016).

II.

A.

To justify certification of a class, plaintiffs must meet all of the requirements of Federal Rule of Civil Procedure 23(a) and satisfy one of the three subsections of Rule 23(b).  The district court certified a class based on Rule 23(b)(3), which requires that "questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy."

"An individual question is one where 'members of a proposed class will need to present evidence that varies from member to member,' while a common question is one where 'the same evidence will suffice for each member to make a prima facie showing [or] the issue is susceptible to generalized, class-wide proof.'" *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 453 (2016) (quoting 2 William B. Rubenstein, Newberg on Class Actions § 4:50, at 196-97 (5th ed. 2012)).  If the plaintiffs' method of proving their claim would "include individualized inquiries that cannot be addressed in a manner consistent with Rule 23, then the class cannot be certified." *Harris v. Union Pac. R.R. Co.*, 953 F.3d 1030, 1035 (8th Cir. 2020) (internal quotation omitted).

Ford alleges that TD Ameritrade violated § 10(b) of the Securities Exchange Act and Rule 10b-5.  We do not address the merits at this stage, but we do consider the nature of the underlying claim to determine its suitability for class certification. *See Harris*, 953 F.3d at 1033.  Section 10(b) forbids the use, in connection with the

purchase or sale of a security, of "any manipulative or deceptive device or contrivance in contravention of" regulations promulgated by the SEC for the protection of investors. 15 U.S.C. § 78j(b). The SEC promulgated Rule 10b-5 to enforce § 10(b). Rule 10b-5 prohibits making an untrue statement of material fact or omitting to state a material fact in connection with the purchase or sale of a security. 17 C.F.R. § 240.10b-5(b). It also forbids engaging in "any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security." *Id.* § 240.10b-5(c).

The Supreme Court has "long recognized an implied private cause of action to enforce [§ 10(b)] and its implementing regulation." *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 267 (2014). To recover damages for violations of § 10(b) and Rule 10b-5, a plaintiff must prove "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 460-61 (2013) (internal quotation omitted).

B.

This case involves a dispute about a broker's compliance with its duty of best execution. Best execution cases differ from typical securities fraud cases under Rule 10b-5, where the alleged fraud directly affects the price of a security. *See Newton*, 259 F.3d at 173, 179-80. When a broker's fraud directly affects the price of a security, the customer trading in that security in reliance on the broker's representation can easily demonstrate that, but for the broker's fraud, the customer's trade would have executed at a more favorable price. *See id.* at 180.

Here, by contrast, the economic loss allegedly caused by TD Ameritrade's order routing practices is "the difference between the price at which [customers'] trades were executed and the 'better' price allegedly available from an alternative trading source." *Id.* at 178. To justify class certification, Ford must show that he can establish this type of economic loss for a class of plaintiffs in a manner consistent with the predominance requirement of Rule 23.

Ford's expert proposes to analyze "hundreds of millions of data points" through an algorithm. The algorithm would assess execution quality by using class trading history data provided by TD Ameritrade and data about the state of the market at the time of each trade. The expert shared the "specification" and "logic" of his proposed algorithm with the parties and the court, but he has not disclosed the software code he proposes to use for automating the analysis.

In *Newton*, the Third Circuit affirmed the denial of class certification in a best execution case. 259 F.3d at 162. The court observed that "[w]hether a class member suffered economic loss from a given securities transaction would require proof of the circumstances surrounding each trade, the available alternative prices, and the state of mind of each investor at the time the trade was requested." *Id.* at 187. The alleged injuries arose out of the execution of "hundreds of millions of trades." *Id.* at 190. Because "[d]etermining which class members were economically harmed would require an individual analysis into each trade and its alternatives," the Third Circuit concluded that individual questions were "overpowering." *Id.* at 189. We find *Newton*'s reasoning persuasive despite Ford's attempts to distinguish it.

Ford contends that *Newton* is inapposite because it involved different technology. In *Newton*, the plaintiffs argued that their expert could "devise a formula for calculating injury and damages." *Id.* at 191. Ford maintains that his expert has already developed an advanced algorithm that can calculate injury and damages on a class-wide basis, and that the inquiry can be completed upon discovery of class-

wide trading history. As such, Ford argues that we need not share *Newton*'s reluctance to "rely on a formulaic nostrum given the consequences if it fails to meet expectations." *Id.* Even with the proposed algorithm, however, we conclude that determining economic loss in this case entails individualized inquiry inconsistent with the predominance requirement of Rule 23.

To succeed on the merits of his claim, Ford must show that TD Ameritrade's order routing practices caused its customers to suffer economic loss. *See Amgen*, 568 U.S. at 460-61. This requirement derives from the "standard rule of tort law that the plaintiff must allege and prove that, but for the defendant's wrongdoing, the plaintiff would not have incurred the harm of which he complains." *Newton*, 259 F.3d at 177 (internal quotation omitted).

Ford's expert proposes to "establish that a 'better' price was obtainable for each executed trade," *id.* at 178, by comparing the trade's actual price with the National Best Bid and Offer (NBBO) price. The NBBO represents the highest price a buyer was willing to pay, and the lowest price a seller was willing to accept, for a particular stock at a given time. But sometimes a trade fails to execute at the NBBO price through no fault of the broker. For example, volatile or otherwise unusual market conditions can prevent a trade from executing at that price. The parties' experts agree that certain transactions must be excluded from the algorithm's analysis to account for instances where TD Ameritrade could not have prevented execution at a price inferior to the NBBO.

The parties' experts disagree, however, about which transactions should be excluded. Ford argues that this disagreement is unresolved only because TD Ameritrade successfully moved to limit discovery of class-wide trading data. Once discovery is complete, he contends, he will be able to identify all necessary exclusions.

The process will not be that simple. Ford's expert explains that third-party companies provide historical stock market information that identifies periods when stocks were traded during unusual market conditions, and argues that his algorithm can filter out unusual market conditions using these data. But TD Ameritrade's expert maintains that not all relevant unusual market conditions are recorded in these market data, and that others must be identified on a case-by-case basis. As one of Ford's experts acknowledged, there is no definitive list of unusual market conditions that account for transactions that depart from the best available price. As a result, the algorithm's use of published market data will not identify all legitimate exclusions, and the experts will have to bring their own judgment to bear to identify further exclusions on a trade-by-trade basis. A trier of fact will then have to resolve these disputes through individualized determinations about the appropriateness of particular exclusions.

Nor do advances in technology render "the state of mind of each investor at the time [a] trade was requested" irrelevant to the economic loss determination. *See Newton*, 259 F.3d at 187. Consider a trader who places two orders to buy shares of a stock, one that he cancels before it is executed, and a second that is identical to the first, but executed at a better price than would have applied to the first order. Even if he canceled the first trade because of a delay in execution caused by TD Ameritrade's order routing practices, whether the cancellation caused economic loss depends on the trader's strategy. If he intended the second order to replace the canceled one, then he is better off than if his first order had been executed. But if he would have placed the second order even if the first order had been executed, then he might be worse off, because he will have fewer shares available to sell for a profit if the price of the stock later goes up. Ford's algorithm cannot account for each customer's trading strategy.

We conclude that despite advances in technology, individual evidence and inquiry is still required to determine economic loss for each class member. *See id.* at

187-88. Advanced computing power can expedite that determination, but it cannot change its underlying nature by converting individual evidence into common evidence. In this case, the prevalence of these individualized inquiries precludes class certification under Rule 23(b)(3).

Another concern with predominance is the nature of the trading conduct at issue. In *Newton*, the plaintiffs challenged the execution of orders at the NBBO price on the ground that their broker failed to investigate whether the orders could have been executed at more favorable prices on alternative trading systems. *See* 259 F.3d at 169-70. In affirming the denial of certification, the court reasoned that "the NBBO listed price may or may not have provided a class member with the best price," depending on the facts of each trade. *Id.* at 180. The court thus declined to presume economic loss across the class, and it was unpersuaded that the plaintiff's proposed formula could determine economic loss for each class member without an array of individual inquiries. *Id.* at 180-81, 187-88.

Ford attempts to distinguish *Newton* on the ground that TD Ameritrade executed orders at prices inferior to the NBBO price when the orders could have been executed at the NBBO price. He argues that this practice is inconsistent with the duty of best execution. His expert's analysis of a limited set of Ford's own trades, however, revealed that a substantial majority were executed at a price better than or equal to the NBBO price. The economic loss analysis for these trades does not differ from *Newton*. And insofar as Ford suggests that execution of other trades at prices inferior to the NBBO price necessarily results in economic loss, we disagree. There are circumstances in which a trade legitimately might execute at a price inferior to the NBBO price, such as when the order size exceeds the number of shares available at the NBBO price at the time of the order. As a result, the price that a class member received on trades executed at prices inferior to the NBBO price "may or may not have provided a class member with the best price," depending on the facts of each

-9-

trade. *Id.* at 180. Assessing the relevant facts of each trade requires individualized inquiries.

Ford argues that a district court in New York approved use of a similar algorithm in a best-execution class action after *Newton*. In *In re NYSE Specialists Sec. Litig.*, 260 F.R.D. 55 (S.D.N.Y. 2009), the court certified a class in a securities fraud case and approved the use of an algorithm to prove economic loss. *Id.* at 80. The type of securities fraud at issue involved specialists using their knowledge of impending customer orders to trade ahead of those orders for the benefit of their own accounts. *Id.* at 64. To measure the resulting economic harm to the customers, the finder of fact was required to match customers' orders with specific trades made by the specialists. *See id.* at 66-67. The next step was to compare the outcome that customers received with the outcome they would have received but for the specialists' alleged misconduct. *See id.* at 80.

That an algorithm could perform the limited matching function in *NYSE Specialists* and satisfy Rule 23 does not establish that an algorithm can solve the predominance problem in this case. Indeed, one of Ford's experts acknowledged that the algorithm in *NYSE Specialists* did not have to identify reasonably available prices for executed trades across all market centers or take into account all of the exclusions that must be considered here. Measuring economic loss in this case is a more complex task, and the individual questions preclude a conclusion that common issues predominate.

The duty of best execution requires that brokers "use reasonable efforts to maximize the economic benefit to the client in each transaction." *Newton*, 259 F.3d at 173 (internal quotation omitted). The duty regulates a broker's process of routing orders for execution, but does not guarantee a specific outcome. As Ford's expert acknowledged, compliance with the duty of best execution does not guarantee that the customer will get the best deal possible. Nor does a violation of the duty of best

execution necessarily cause a customer economic loss. As in *Newton*, "[b]ecause economic loss cannot be presumed, ascertaining which class members have sustained injury means individual issues predominate over common ones." *Id.* at 190. The district court therefore abused its discretion in certifying a class under Rule 23(b)(3).

## C.

There is an independent problem with the class as defined by the district court: it is an impermissible "fail-safe class." The class consists of "[a]ll clients of TD Ameritrade . . . who placed orders that did not receive best execution, in connection with which TD Ameritrade received either liquidity rebates or payment for order flow, and who were thereby damaged." This definition incorporates two contested elements of liability—failure to seek best execution and economic loss. By defining the class to include only those customers who were harmed by TD Ameritrade's alleged failure to seek best execution, the district court certified a class in which membership depends upon having a valid claim on the merits.

Such a class is impermissible because it allows putative class members to seek a remedy but not be bound by an adverse judgment. *Orduno v. Pietrzak*, 932 F.3d 710, 716 (8th Cir. 2019). Fail-safe classes are also unmanageable, *see* Fed. R. Civ. P. 23(b)(3)(D), "because the court cannot know to whom notice should be sent." *Orduno*, 932 F.3d at 717. If a fail-safe class is certified as a means of avoiding a predominance problem under Rule 23(b)(3), "its independent shortcomings are an alternative basis" to reverse class certification. *Id.*

\*     \*     \*

For the foregoing reasons, we reverse the district court's order certifying a class and remand for further proceedings.

_____